Filed 3/30/21  P. v. Navas CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B301818 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA109347) |
| v. | |
| RYAN DAVID NAVAS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Judith L. Meyer, Judge.  Affirmed.

Lenore De Vita, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Ryan David Navas appeals from a judgment of conviction entered after a jury found him guilty of second degree robbery of a cell phone. Navas contends the trial court abused its discretion in admitting evidence of his gang tattoo and a 911 call. Navas also argues the trial court was required to dismiss one of his two prior strike convictions pursuant to *People v. Vargas* (2014) 59 Cal.4th 635 (*Vargas*). Navas contends in the alternative the trial court abused its discretion in denying his motion to dismiss one or both of the strike convictions pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*). Finally, Navas claims the trial court's imposition of court assessments and restitution fines without an ability-to-pay hearing violated his due process rights under this court's opinion in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *The Prosecution Case*

On May 26, 2018 at approximately 5:00 p.m., Tyrik Herbert, Jemani Williamson, Anthony Burgos, Shani Anderson, Ashley Lewis, and Leah Sines were talking while gathered around a picnic table at a park. Navas, whom Herbert described as a "skinny" Latino wearing glasses and dressed in black clothes, approached the group and asked, "Do you guys got a phone I can use?"[1] According to Herbert, Anderson said, "No. None of us have no phone for you to use, bro. Can you please,

_____

[1]      When Herbert was asked if the individual was in court, Herbert replied, "I think so," and he identified Navas.

2

like, go." She added, "I'm going to need you to step a little bit away from the stroller, too, because you kind of by my baby's stroller." Herbert, who was seated in front of the baby stroller, said, "Bro, do you think you can kind of, like, back up a little bit?" Navas, who was on the right side of the stroller, answered, "I'm not by the stroller." Herbert replied, "Bro, you kind of is, though." Navas did not move, but he again asked, "Can I use someone's phone?" One of Herbert's friends responded, "No. Nobody has a phone for you to use."

Navas then grabbed Burgos's cell phone off the picnic table. Burgos said to Navas, "Hey, what are you doing?" Navas punched Burgos in the face and knocked him to the ground. Navas ran off with the cell phone, and Herbert, Burgos and Williamson chased him. They caught up to Navas and grabbed his shirt. Navas pulled off his shirt, and Herbert saw a tattoo that said "Longo" on Navas's stomach. Herbert and his friends fought Navas "for a long time" and punched and kicked Navas "a lot." Navas dropped Burgos's cell phone onto the ground, and Lewis picked it up. Navas told the men, "I'll be back."

Shortly after 5:00 p.m. Anderson called 911 to report the incident. She told the 911 operator, "I need the police. There's a man up here causing problems and there's a fight right now." Anderson reported, "It's . . . three on one but the guy came up here trying to steal our phone." When asked the man's ethnicity, Anderson responded, "He's Mexican. He's in a gang. He got it tatted on his stomach." The 911 operator asked, "What does he have tatted on his stomach?" Anderson replied, "Longos."[2]

---

[2] The transcript of the 911 call reflects that Anderson described the tattoo as "Longos," although the other witnesses described it as "Longo."

3

Anderson reported the man was "in his late 30's or 20's," wore "jeans," and "doesn't have a shirt on." Anderson added, "He's wandering around. Can you please send somebody [up right] now?" The 911 operator responded, "We will send somebody out there, okay? Is he beating someone up right now?" Anderson replied, "Yes. He tried to kidnap my son and he tried to steal . . . my friend's phone." Further, the phone "was on the table and he just snatched it and tried to run. He's still here. Like send somebody right now." Anderson reported the man still had the cell phone, but she did not see a weapon on him. Anderson continued, "Can you just, please? Like he's up here. He's trying to kidnap people's kids and steal from them and the police is not here yet." Anderson explained, "He was standing in front of my son and tried to take off with my son in—in his stroller." Anderson further reported the man was "just walking around in a circle" and "looked like he's high."

A little after 5:00 p.m. Jose Manuel Murillo, who was in his apartment about 200 feet from the park, heard people screaming and looked outside his window. He saw a White person argue with a Black man. Murillo testified, "I saw that the two were fighting, and then when the White person started hitting the Black person, two other Black people jumped, trying to help the—the Black guy." Murillo added, "They grabbed him by his shirt—and he tried to break loose, and he tried to do that, and then he let go of his shirt. He—he was shirtless, totally shirtless." Murillo called 911 when he saw "there were three fighting against one."

Long Beach Police Officer Justin Van Dyk and his partner, Officer Sun, arrived in their patrol car in response to Anderson's 911 call. Officer Van Dyk saw people yelling at each other. Then

Officer Van Dyk saw "a tall, thin-build male Hispanic wearing all black clothing run westbound on Plymouth Street and then northbound on Locust Avenue." At trial, Officer Van Dyk testified Navas was the man he saw running. The group of five to seven people pointed to Navas, saying, "He did it. That's him."

Officer Sun turned the patrol car around and drove northbound on Locust Avenue. When they reached Market Street, Officer Van Dyk got out of the patrol car, and Officer Sun drove back to the park. By this time, Long Beach Police Officer David Cabrera had arrived at the scene. Officer Cabrera saw Navas walking southbound on Locust Street and alerted Officer Van Dyk. Officer Van Dyk walked toward Navas, but then Navas looked at him and started to run. Officer Van Dyk grabbed Navas's arm and detained him. According to Officer Van Dyk, Navas "had a laceration on the left side of his head." Officer Cabrera identified Navas at trial as the man he saw walking southbound on Locust Avenue, a half block from the park.

Long Beach Police Officer Gabriella Rodriguez arrived at the scene after Navas had been handcuffed, and she placed him in the back of her patrol car. Navas was shirtless, and Officer Rodriguez saw a "Longo" tattoo above Navas's abdomen. In rebuttal testimony, Officer Rodriguez testified Navas had a cell phone on him during booking. She did not turn on the cell phone to determine whether it was working.

B.    *The Defense Case*
Navas testified that shortly before 5:00 p.m. on May 26, 2018, he left his sister's house and walked toward the train station to take the train to Downey to visit his girlfriend. Navas wanted to let his girlfriend know he was coming, but he did not

5

own a cell phone, and there were no pay phones in the area. On his way to the train station, he approached a group of five to six men and women at the park and asked to borrow a cell phone. Navas stood in front of the bench facing the picnic table with the stroller to his left. Navas testified, "I believe they—they said I was standing too close to it, and I just moved my hand, like, 'Hey, look. I'm not by the baby carriage.'" Navas "continued to ask the group if [he] could use their phone." Navas thought he heard a Hispanic male say "Go ahead."

Before Navas could pick up the cell phone, the man slapped his hand hard. In response, Navas hit the man in the face with his left hand. Navas testified, "I knew I was going to get into a fight, so I turned around and I started running." Navas knew people were chasing him because he got hit in the back of his head and knocked to the ground. Once he was on the ground, three men kicked and hit his face. Navas defended himself by swinging his hands and blocking the blows. Navas eventually got back on his feet, but the men attacked him again. At one point the men grabbed Navas's shirt, so Navas pulled it off. After a third altercation, Navas was able to get away from the men. He heard someone yell, "Hey, he's over here. He's over here." When he saw the police officers, he "took off running" because he was "being accused of something already." Navas did not see the cell phone again after he saw it on the picnic table. After Navas was detained, he was taken to the hospital because he had a cut in front of his left ear. He explained to the police officers he had fallen "because [he knew] they weren't going to believe [him], so his main thing was . . . [he] didn't want to speak about it at the time." Navas testified he was under the influence of alcohol, which "might have" impaired his ability to hear and perceive. He

6

admitted he was convicted of a "violent theft crime" and a "violent assault crime" in 2000.

C.    *The Verdict and Sentencing*

The jury found Navas guilty of second degree robbery (Pen. Code, § 211).[3]  In a bifurcated proceeding, Navas admitted he had suffered two prior convictions of attempted murder and robbery in the same case.[4]

At the September 26, 2019 sentencing hearing, the trial court denied Navas's motion to strike one of his prior felony convictions under *Vargas, supra,* 59 Cal.4th 635 and *Romero, supra,* 13 Cal.4th 497.  The court sentenced Navas as a third strike offender to 25 years to life in prison.  The court dismissed under section 1385 the five-year enhancement for Navas's prior serious felony conviction.  The court ordered Navas to pay a $30 criminal conviction assessment, a $40 court security fee, and a $10 crime prevention fund fine.  The court also imposed a $2,000 restitution fine and imposed and suspended a parole revocation restitution fine in the same amount.

---

[3]    An additional count alleging the battery of Williamson was dismissed after the close of evidence in the interest of justice.  All further undesignated statutory references are to the Penal Code.

[4]    Although Navas did not admit his prior convictions were serious or violent felonies under the three strikes law (§§ 667, subds. (b)-(j), 1170.12) and serious felonies within the meaning of section 667, subdivision (a)(1), as alleged, Navas conceded in his sentencing memorandum and at sentencing that the felonies constituted prior strikes, and he did not argue they were not serious felonies.  Rather, as discussed below, Navas argued one of the strike convictions should be dismissed.

Navas timely appealed.

## DISCUSSION

A.  *Admission of Evidence Relating to Navas's Gang Tattoo*
    1.  *Trial court proceedings*

Prior to trial, defense counsel moved to exclude any evidence of gang affiliation because there was no gang allegation. The trial court ruled, "Anything that a witness observes, sees, or [hears] is coming in, and if it goes to an element of fear, then they can testify to the element of fear. . . . [I]t's not coming in for gang enhancement, but it definitely comes in for purposes of fear. [¶] Quite frankly, [Navas is] lucky a gang enhancement wasn't added to this. He's doing exactly what that gang enhancement is for, which is to try to promote a gang by saying all of that. So it does—under [Evidence Code section] 352, I find it very—not overly prejudicial, so I'm going to allow [it] in [for] motive[, identification,] and an element of the offense."

At trial during a sidebar, defense counsel objected to a photograph of Navas's upper body with a gang tattoo, which the People intended to show to Herbert, who had seen Navas at the park without a shirt. The court ruled the photograph was relevant to identification and could be shown to Herbert for that purpose, and further, Officer Rodriguez could look at Navas's stomach and then testify that Navas had the tattoo. The court agreed with defense counsel, however, that the gang tattoo was not relevant to the fear element of robbery because Herbert was not the robbery victim. The court ruled the prosecutor could mention the tattoo in his closing argument for identification purposes, but he could not discuss the gang.

When the prosecutor later showed Officer Rodriguez the photograph, Officer Rodriguez identified the "Longo" tattoo as the tattoo she saw above Navas's abdomen when she placed him in her patrol car. The prosecutor then showed the photograph to the jury. Herbert testified he saw Navas had a "Longo" tattoo on his stomach. The jury also heard the 911 call in which Anderson reported the robber was Hispanic, in a gang, and had a "Longos" tattoo on his stomach. During his closing argument, the prosecutor stated, "Here's the defendant with his Longo tattoo, as described on the 911 call. 'There's a guy here causing trouble. This is what he's doing.' And then, 'What does he have on him?' 'He has a Longo tattoo.' When the officers show up, this is the defendant, this is who they see, and this is who runs away."

　　2.　　*Governing law*
"'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."'" (*People v. Hardy* (2018) 5 Cal.5th 56, 87; accord, *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 822.) "'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*Hardy*, at p. 87; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105.)

"'[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends

9

to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'"'" (*People v. Jones* (2017) 3 Cal.5th 583, 610; accord, *People v. Bell, supra*, 7 Cal.5th at p. 105 ["'"Evidence is not prejudicial, as that term is used in [an Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent.'"'"].) "'[T]he trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal absent an abuse of that discretion.'" (*People v. Hardy, supra*, 5 Cal.5th at p. 87; accord, *Bell*, at p. 105.)

> 3. *The trial court did not abuse its discretion in allowing the witnesses to testify about Navas's gang tattoo for purposes of identification*

Navas contends his gang tattoo was not relevant to the issue of identity because he admitted he was the person who approached the group of people at the park and asked to borrow a cell phone.[5] But Navas made his admission during the defense case after the People already had presented their case. Navas also argues the People could have established identity without referring to his gang tattoo. However, absent the gang tattoo, the evidence Navas was the person who stole the cell phone was

---

[5] We do no reach whether the gang tattoo was admissible to show motive or fear because neither was the basis for the trial court's final ruling.

equivocal. Murillo testified he saw a White man argue and punch a Black man, and then two other Black men joined the fight against the White man. Murillo did not identify Navas (who was Latino) as the White man. When Herbert was asked during his examination if he saw the person who took the cell phone, he responded, "I think so." The prosecutor asked, "And can you say where he's sitting, and tell me what he's wearing?" Herbert responded, "Is it him with the blue—little shirt on[?]"[6] In addition, Anderson, who stated in the 911 call the robber had a gang tattoo, did not testify and never identified Navas as the perpetrator.

Officer Rodriquez identified Navas in court, but she first saw him after the other officers had handcuffed him, at which time she placed him in her patrol car. Officer Cabrera identified Navas as the person he saw walking southbound on Locust Avenue half a block from the park, but he did not see Navas while Navas was still in the park. Officer Van Dyk first saw a "tall, thin-build" Hispanic man at the park, but he lost sight of the man after the man fled. Officer Van Dyk did not see Navas again until he learned of Navas's location from Officer Cabrera and then encountered Navas walking southbound on Locust Avenue. Given that identification was at issue, the trial court did not abuse its discretion in admitting evidence of Navas's gang tattoo to show Navas was the person who committed the robbery at the park.[7]

---

[6] The trial transcript reflects Herbert was "indicating" or gesturing to Navas when he answered the question.

[7] Navas could have requested a limiting instruction to minimize the prejudice from the gang evidence, but he failed to

B.    *Admission of Anderson's 911 Call*

   1.    *Trial court proceedings*

Prior to trial, the People moved to admit Anderson's 911 call. In their written motion, the People asserted Anderson's statements were not testimonial and were admissible under the spontaneous statement exception to the hearsay rule. Defense counsel objected to admission of the 911 call, arguing only that Anderson's statements were testimonial. After the trial court confirmed that at the time of Anderson's call the fight was ongoing and the police had not yet arrived, the trial court overruled Navas's objection, explaining, "[B]ased on what I'm hearing, . . . this is an active situation that's ongoing. It comes in under contemporaneous statements. It doesn't even appear to be testimonial. She's worried about safety. She's worried about somebody being kidnapped. Whether it's true or not, it doesn't really matter. It's just her ongoing emergency. So despite defense counsel's arguments, the court is going to allow that in."

On appeal, Navas concedes Anderson's statements were "arguably admissible" as contemporaneous or spontaneous statements,[8] and he does not contend the statements were

---

request one, and he does not contend on appeal the failure to give a limiting instruction was error.

[8]    Evidence Code section 1240 provides for an exception to the hearsay rule where a statement "[¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (See *People v. Sanchez* (2019) 7 Cal.5th 14, 39; *People v. Penunuri* (2018) 5 Cal.5th 126, 152.) Anderson's statements to the 911 operator asking for help were made under

12

testimonial.  Instead, Navas argues Anderson's statements to the 911 operator that a gang member stole a cell phone and tried to kidnap Anderson's child should have been excluded as cumulative evidence or as overly prejudicial under Evidence Code section 352.  Navas acknowledges his trial counsel did not object on these grounds, but he asserts he did not forfeit his objection because an objection would have been futile.  Alternatively, Navas contends his trial counsel's failure to object on these grounds was ineffective assistance of counsel.  Neither contention has merit.

2. *Navas forfeited any challenge to the 911 call as cumulative or unduly prejudicial*

The prejudicial value of evidence may "outweigh its probative value if it is merely cumulative regarding an issue not reasonably subject to dispute."  (*People v. Tran* (2011) 51 Cal.4th 1040, 1049; accord, *People v. Williams* (2009) 170 Cal.App.4th 587, 610-611.)  However, Navas did not object to the admission of the 911 call based on its cumulative nature or undue prejudice, thereby forfeiting his claim.  (Evid. Code, § 353, subd. (a); *People v. Cage* (2015) 62 Cal.4th 256, 282 ["Defendant forfeited his claims by failing to object to any of the testimony on the grounds he now raises."]; *People v. Fuiava* (2012) 53 Cal.4th 622, 721 ["'In accordance with [section 353 of the Evidence Code], we have consistently held that the 'defendant's failure to make a

_____

the stress of excitement as she witnessed the cell phone theft, the fight, and Navas encroaching on Anderson's baby stroller.

13

timely and specific objection' on the ground asserted on appeal makes that ground not cognizable."'"'].)

Navas contends any further objection to the admission of the 911 call would have been futile. He is correct that a defendant is not required to make a futile objection to preserve an objection for appeal. (See *People v. Brooks* (2017) 3 Cal.5th 1, 92 ["'[R]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence.'"]; *People v. Clark* (2011) 52 Cal.4th 856, 960 ["The failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm."].) But Navas fails to explain why it would have been futile to object to admission of the 911 call based on the call being cumulative or unduly prejudicial. Instead, he generally argues that "given the trial court's ruling and comments, any additional objections [Navas's] trial counsel could have made would have been overruled." Navas fails to point to any statements by the court that show an objection would have been futile. To the contrary, the court addressed Navas's stated objection that the 911 call was testimonial, noting that Anderson's statements were made during an ongoing emergency in response to her fear for her safety and concern her child would be kidnapped. Thus, Navas has failed to meet his burden to show a further objection would have been futile.

3.  *Defense counsel did not provide ineffective assistance of counsel*

"'""To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an

14

objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant."'" (*People v. Rices* (2017) 4 Cal.5th 49, 80; accord, *People v. Bell, supra,* 7 Cal.5th at p. 125; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.) With respect to the prejudice prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Harrington v. Richter* (2011) 562 U.S. 86, 111-112 ["[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome. . . . The likelihood of a different result must be substantial, not just conceivable."].) "If [the defendant] cannot show prejudice, we may reject his claim of ineffective assistance, and need not address the adequacy of trial counsel's performance." (*People v. King* (2010) 183 Cal.App.4th 1281, 1298; see *Strickland*, at p. 697 ["[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."].)

Navas argues defense counsel should have requested redaction of Anderson's statements that she believed Navas was going to kidnap her child, Anderson's references to Navas's gang tattoo, and her statement that he was "in a gang." But Navas fails to meet his burden to show to a reasonable probability that he would have achieved a more favorable result had portions of the 911 tape been redacted. (*People v. Bell, supra*, 7 Cal.5th at p. 125; *People v. Rices, supra*, 4 Cal.5th at p. 80.) Herbert testified Navas grabbed Burgos's phone without permission, punched Burgos in the face, and fled with the cell phone.

15

Anderson likewise described the fight resulting from the robber "trying to steal our phone." And the jury heard testimony from Herbert that Navas was too close to the baby stroller and Herbert repeatedly asked Navas to back up, but Navas refused to move. There was no reasonable probability had the jury not heard the additional statements by Anderson that she believed Navas was trying to kidnap her son or other children (which was consistent with Herbert's testimony), the jury would have found Navas was not guilty of second degree robbery. And as discussed, Anderson's statement that the robber had a gang tattoo on his stomach was relevant to the identification of Navas. Although other witnesses testified as to Navas's gang tattoo (including Herbert), Anderson's testimony further pointed to Navas as the robber. Anderson's personal opinion that Navas was a gang member was not unduly prejudicial given that the jury heard he had a gang tattoo. As the Supreme Court explained in *People v. Tran, supra*, 51 Cal.4th at page 1049, "[T]he prosecution cannot be compelled to "'present its case in the sanitized fashion suggested by the defense.'" [Citation.] When the evidence has probative value, and the potential for prejudice resulting from its admission is within tolerable limits, it is not *unduly* prejudicial and its admission is not an abuse of discretion."

C.    *The Trial Court Did Not Err in Denying Navas's* Vargas *Motion*

    1.    *Navas's prior convictions*

Navas admitted he had suffered convictions of attempted murder and robbery in connection with the 2000 robbery and shooting of Javier Maldonaldo by Navas and codefendant Jesus Salvador Avelar, in which Avelar was the shooter. As the Court

16

of Appeal in *People v. Avelar* (Aug. 15, 2003, B158761) [nonpub. opn.] described the evidence at trial: "Avelar approached Maldonaldo in the parking lot and asked for a cigarette. Avelar then produced a handgun, pointed it at Maldonaldo, said the gun was real, threatened to kill Maldonaldo and demanded money. Maldonaldo removed an unknown amount of cash from his pocket and either gave it to Avelar or dropped it on the ground. Navas removed a wallet from the back pocket of Maldonaldo's pants. Also taken in the attack was Maldonaldo's checkbook. The assailants said to give them all the money and asked if Maldonaldo had money in his shoe. Maldonaldo had his hands raised after Navas took his wallet to demonstrate that he was not going to defend himself. Maldonaldo closed his eyes and kept his arms raised in front of his head. Maldonaldo heard a shot that struck him in the right hand. Maldonaldo returned to the restaurant and described the assailants to a 911 operator as 19-year-old Hispanic males with shaved heads and dark clothing."

The jury convicted Avelar and Navas of attempted murder and robbery. It found Avelar personally discharged a firearm, and as to Navas, a principal personally used and discharged a firearm causing great bodily injury. (*People v. Avelar, supra*, B158761.) The Court of Appeal affirmed the attempted robbery convictions but reversed the convictions of attempted murder because the trial court failed to bifurcate the trial of the criminal street gang enhancement. The Court of Appeal also reversed the true finding on the gang enhancement for lack of sufficient evidence and the firearm enhancements that depended on the gang enhancement. (*Avelar*, B158761.) On remand, Navas pleaded guilty to attempted murder and admitted the firearm

17

enhancement that a principal used a firearm. The trial court stayed the sentence for the robbery count under section 654 and sentenced Navas to 10 years in state prison.

### 2. *Navas's* Vargas *motion*

Prior to sentencing, Navas filed a *Vargas* motion to strike one of his two prior strike convictions for robbery and attempted murder on the basis the two offenses arose from a single act by Navas, taking Maldonado's wallet out of his pocket. At sentencing, the trial court denied Navas's motion, explaining, "[T]his particular case is about as tough as it gets as far as deciding whether under *People versus Vargas* it applies. And quite frankly, the court could just take the safe route and say, well, *People versus Vargas* applies . . . . [¶] But in this case, we have very distinctly different acts that are going on even though it was under a single course of conduct. . . . It's my understanding somebody did, in fact, get shot . . . and the mere fact of a gun is one thing on a [robbery] and an actual shooting is another. And [Navas] did, in fact, plead to having a specific intent to kill which is separate and apart from having specific intent to take property. [¶] . . . [T]he court is not taking the safe route, and I feel that they are [two] individual separate strikes that would qualify under the California three strikes law."

### 3. *The trial court was not required to dismiss one of the prior strike convictions under* Vargas

In "extraordinary" cases, where a defendant's two prior strike convictions were based on the same act, the court must dismiss one of the strike allegations. (*Vargas, supra*, 59 Cal.4th at p. 641.) In *Vargas*, the defendant was convicted of carjacking

18

and robbery arising from the commission of a single act, "forcibly taking the victim's car." (*Id.* at p. 645.)  Years later, the defendant was convicted of first degree burglary, grand theft, and conspiracy to commit grand theft.  (*Id.* at p. 639.)  The trial court granted the defendant's motion to dismiss the carjacking conviction as to the grand theft and conspiracy counts, but not the burglary count.  (*Ibid.*)  The Supreme Court reversed, holding that because the two prior strikes arose from the defendant's single act against the same victim, the trial court was required to dismiss one of the two prior strike convictions in the subsequent proceeding.  (*Id.* at p. 644.)  The court analogized the three strikes law to three strikes in baseball, explaining that where the strike convictions were based on a single criminal act, sentencing the defendant as a third strike offender would be like calling a baseball player out "for two strikes on just one swing." (*Id.* at p. 646.)

The *Vargas* court emphasized that dismissal of a prior strike conviction is not warranted where "the offender committed more than one act, whether separately or during a continuous course of conduct," as in *People v. Benson* (1998) 18 Cal.4th 24 (*Benson*).  (*Vargas, supra*, 59 Cal.4th at p. 646.)  In *Benson*, the defendant entered the victim's apartment on the pretense of retrieving his keys, and once inside, he grabbed the victim, forced her to the floor, and stabbed her multiple times.  (*Benson,* at p. 27.)  The defendant was convicted of residential burglary and assault with the intent to commit murder, with the sentence for the assault conviction stayed pursuant to section 654.  (*Ibid.* & fn. 4.)  The *Benson* court concluded that although the sentence on the assault count was stayed, both offenses constituted strikes for purposes of the three strikes law, explaining, "In our view, the

19

electorate and the Legislature rationally could—and did—conclude that a person who committed additional violence in the course of a prior serious felony (e.g., shooting or pistol-whipping a victim during a robbery, or assaulting a victim during a burglary) should be treated more harshly than an individual who committed the same initial felony, but whose criminal conduct did not include such additional violence." (*Id*. at p. 35.)

Here, Navas's prior offenses of robbery and attempted murder were separate acts that occurred during a continuous course of conduct. When Avelar initially pointed a gun at Maldonaldo and demanded money, Maldonaldo complied by handing over the money or dropping it on the ground. After Navas removed Maldonaldo's wallet and checkbook from his back pocket, Maldonaldo raised his arms to indicate he would not resist. When Maldonado did not respond to Navas's and Avelar's follow-up request for money, Avelar shot the victim in his right hand. The act of shooting Maldonaldo was a separate act of violence committed in the course of the robbery, similar to the assault of the victim in *Benson* in the course of the residential burglary. (See *Benson, supra*, 18 Cal.4th at p. 27.)

D.    *The Trial Court Did Not Abuse Its Discretion in Denying Navas's* Romero *Motion*
    1.    *Trial court proceedings*
Navas argued in his written motion to dismiss that if the court did not dismiss one of his prior strike convictions under *Vargas*, it should dismiss one or both of his prior strikes under *Romero* and section 1385. At sentencing, defense counsel argued Navas committed the prior strike offenses 19 years earlier (in 2000); Navas was not the shooter and was only 19 years old; and

20

the current offense involved no weapons.  Defense counsel further argued Navas's abusive childhood led him to drugs and gang involvement.

The People argued in their sentencing memorandum and at the sentencing hearing that although Navas's strike offenses were committed in 2000, each time he was released from custody, he reoffended.  Prior to committing the strike offenses, Navas had a juvenile adjudication for possession of a dangerous weapon in 1997; a misdemeanor burglary conviction in 1999; and a separate misdemeanor trespassing conviction in 1999.  Navas was convicted of attempted murder and robbery in 2002, then he was released after serving a seven-year term.  In 2012 he was convicted of felony possession of a controlled substance and was again sentenced to seven years in state prison.  In 2018 Navas was convicted of three misdemeanors on separate occasions: contempt of court for violation of a gang injunction, possession of controlled substance paraphernalia, and vandalism.  Navas was on summary probation for the misdemeanor contempt offense when he committed the current offense.

The trial court denied the *Romero* motion, finding Navas had a "consistent" criminal history, and although he did not use a weapon in the current offense, he committed "violent conduct as far as the robbery is concerned, and it's just a pattern that this court doesn't really know what to do with."  As to Navas's background, character, and prospects, the court acknowledged Navas's "rough upbringing," but the court observed Navas was 38 years old and still was part of a gang (having violated a gang injunction in 2018), he had "escalating behavior," and "nothing seems to work."  The court concluded Navas was not outside the

spirit of the three strikes law and sentenced him to 25 years to life, after striking the five-year sentence enhancement.

    2.    *Governing law*

A trial court has discretion under section 1385, subdivision (a), to dismiss a strike conviction for purposes of sentencing in furtherance of justice.  (*People v. Williams* (1998) 17 Cal.4th 148, 158 (*Williams*); *Romero, supra*, 13 Cal.4th at p. 530.)  In determining whether to strike a prior conviction, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [three strikes] scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, at p. 161; accord, *People v. Johnson* (2015) 61 Cal.4th 674, 689.)

"[A] court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard." (*People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*); accord, *In re Large* (2007) 41 Cal.4th 538, 550 [petitioner failed to rebut "'strong presumption' [citation] that the trial judge properly exercised his discretion in refusing to strike a prior conviction allegation"].)  A trial court does not abuse its discretion unless its ruling "is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony,* at p. 377; accord, *People v. McDowell* (2012) 54 Cal.4th 395, 430.)  The party challenging the sentence has the burden to show the sentence was irrational or arbitrary.  (*Carmony*, at p. 376; *People v. Avila* (2020) 57 Cal.App.5th 1134, 1140 (*Avila*).)  "'"In

the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'" [Citations.] . . . "'"An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge."'"'" (*Carmony*, at pp. 376-377.)

Because the three strikes law "creates a strong presumption that any sentence that conforms to [the law's] sentencing norms is both rational and proper," there are very limited circumstances under which the appellate court will find an abuse of discretion. (*Carmony, supra*, 33 Cal.4th at p. 378.) These circumstances include where the court is unaware of its discretion to strike a prior conviction, it considers impermissible factors, or, under the circumstances, imposition of a three strikes sentence would be irrational or arbitrary. (*Ibid.*; *Avila, supra*, 57 Cal.App.5th at pp. 1140-1141.) Only under extraordinary circumstances does the court's failure to strike a prior conviction constitute an abuse of discretion. (*Carmony*, at p. 378; *People v. Finney* (2012) 204 Cal.App.4th 1034, 1040 ["Once a career criminal commits the requisite number of strikes, the circumstance must be "extraordinary" before he can be deemed to fall outside the spirit of the three strikes law."].)

3.      *The trial court did not abuse its discretion*

Navas has failed to show the trial court's ruling in denying his *Romero* motion was "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony, supra*, 33 Cal.4th at p. 377.) The trial court was aware of its discretion and specifically considered the factors set forth in *Williams,*

23

*supra*, 17 Cal.4th 148. As to Navas's criminal background, the court observed that Navas had a consistent pattern of committing crimes, which had not abated following the commission of his strike offenses. Although the strike offenses were remote in time (and committed as part of one incident), a trial court does not abuse its discretion in refusing to strike a prior conviction where the defendant continues to reoffend. (*Carmony, supra*, 33 Cal.4th at pp. 378-379 [trial court did not abuse its discretion in refusing to strike three remote prior strike convictions, including 16-year-old conviction, where the defendant was a ""revolving door" career criminal'" and had not addressed his substance abuse problem]; see *People v. Pearson* (2008) 165 Cal.App.4th 740, 749 [trial court did not abuse its discretion in refusing to strike three prior robbery convictions suffered up to 24 years before the current offense, noting "the defendant has led a continuous life of crime"]; *People v. Philpot* (2004) 122 Cal.App.4th 893, 906 [trial court did not abuse its discretion in denying a motion to strike a remote prior strike conviction where the "defendant consistently committed criminal offenses for the past 20 years"].)

As discussed, Navas was released from custody after serving a seven-year sentence for his strike offenses; then just a few years later he committed a drug offense (in 2012) and was again sentenced to seven years in prison. Navas was then convicted of three misdemeanor offenses in 2018 and was on summary probation for violating a gang injunction when he committed the instant offense. As the trial court explained, "[N]othing seems to work," observing Navas continued to commit offenses after being sentenced to prison. Thus, as in *Carmony, supra*, 33 Cal.4th at pages 378 to 379, Navas was a ""revolving door" career criminal'" who had not addressed any problems that

had caused him previously to offend. Further, to the extent Navas had a problem with drug addiction, there was no evidence he did anything to address the problem. As the Supreme Court found in *Carmony*, in affirming the trial court's denial of the motion to dismiss the prior strikes, the defendant there "had also done little to address his substance abuse problems." (*Carmony,* at p. 378; see *People v. Leavel* (2012) 203 Cal.App.4th 823, 837 [the defendant failed to cite evidence showing "treatment for his mental health and substance abuse problems that he claims led to the crimes"].)

As to the current offense, the court acknowledged Navas did not use a weapon, but the robbery involved "violent conduct." After grabbing Burgos's cell phone, Navas punched Burgos in the face and knocked him to the ground, then fled. The court also considered Navas's background, character, and prospects. Although the court recognized Navas's difficult upbringing and youth at the time of the strike offenses, the court expressed concern that at the age of 38 (at the time of the current offense), Navas should have grown out of a life of crime, but instead he was still in a gang, having been found in violation of a gang injunction earlier in 2018. The court reasoned that if it dismissed one of the strikes and sentenced Navas to 15 years in prison (the upper term of five years doubled, plus the five-year sentence enhancement), this was not likely to change Navas's behavior given that two prior seven-year sentences had not made a difference. As the court explained, "if he hasn't grown up by 38, I don't think 50-whatever is going to make a difference."

E.    *Remand Is Not Warranted for an Ability-to-pay Hearing on the Fines and Assessments*

Navas contends the trial court's imposition of fines and assessments without holding a hearing on his ability to pay violated his due process rights, relying on this court's opinion in *Dueñas, supra*, 30 Cal.App.5th 1157. However, as the People argue, Navas was sentenced on September 26, 2019, more than eight months after *Dueñas* was decided on January 8, 2019. On these facts, application of the doctrine of forfeiture is appropriate.

In *Dueñas*, this court concluded "the assessment provisions of Government Code section 70373 and Penal Code section 1465.8, if imposed without a determination that the defendant is able to pay, are . . . fundamentally unfair; imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution." (*Dueñas, supra*, 30 Cal.App.5th at p. 1168; accord, *People v. Belloso* (2019) 42 Cal.App.5th 647, 654-655 (*Belloso*), review granted Mar. 11, 2020, S259755.)[9] In contrast to court assessments, a restitution fine under section 1202.4, subdivision (b), "is intended to be, and is recognized as, additional punishment for a crime." (*Dueñas*, at p. 1169; accord, *Belloso*, at p. 655.) Section 1202.4, subdivision (c), expressly provides a defendant's inability to pay a restitution fine may not

---

[9]    The Supreme Court granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47 to decide the following issues: "Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? If so, which party bears the burden of proof regarding defendant's inability to pay?" (Supreme Ct. Minutes, Nov. 13, 2019, p. 1622.)

26

be considered as a "compelling and extraordinary reason" not to impose the statutory minimum fine.  However, as this court held in *Dueñas*, to avoid the serious constitutional questions raised by imposition of such a fine on an indigent defendant, "although the trial court is required by . . . section 1202.4 to impose a restitution fine, the court must stay the execution of the fine until and unless the People demonstrate that the defendant has the ability to pay the fine." (*Dueñas*, at p. 1172; accord, *Belloso*, at p. 655.)

In *People v. Castellano* (2019) 33 Cal.App.5th 485, 489 (*Castellano*), we held a defendant's failure to object to the imposition of fines and fees before *Dueñas* was decided does not constitute forfeiture.  But here, Navas was sentenced more than eight months after *Dueñas* was decided.  Thus, unlike in *Castellano*, Navas's challenge on appeal is not "based on a newly announced constitutional principle that could not reasonably have been anticipated at the time of trial." (*Castellano,* at p. 489.)  In addition, there are no special circumstances or legal issues that would warrant us to exercise our discretion to excuse forfeiture.  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["application of the forfeiture rule is not automatic," although "the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue"]; *Unzueta v. Akopyan* (2019) 42 Cal.App.5th 199, 215 ["'[N]either forfeiture nor application of the forfeiture rule is automatic.'"].)[10]

_____

[10]    Navas contends if we find forfeiture, his attorney's failure to object to imposition of the fines and fees was ineffective assistance of counsel.  His claim of ineffective assistance of counsel fails because the record does not reflect why his attorney

27

# DISPOSITION

The judgment is affirmed.

FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.

---

did not object to imposition of the fines and fees. His attorney may have decided not to object because an objection would have been futile in light of Navas's long sentence and the limited amount of the total fines and assessments. (See *People v. Caro* (2019) 7 Cal.5th 463, 488 ["On direct appeal, if the record '"sheds no light on why counsel acted or failed to act in the manner challenged,"' we must reject the claim '"unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation."'"]; *People v. Mickel* (2016) 2 Cal.5th 181, 198 ["[A] reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission."].)